**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DERRICK GIBSON, | : | Civil No. 3:22-cv-1538 |
| | : | |
| Plaintiff | : | (Judge Mariani) |
| | : | |
| v. | : | |
| | : | |
| SUPERINTENDENT BERNADETTE | : | |
| MASON, *et al.*, | : | |
| | : | |
| Defendants | : | |

**MEMORANDUM**

Plaintiff Derrick Gibson ("Gibson"), an inmate in the custody of the Pennsylvania

Department of Corrections ("DOC"), initiated this civil rights action pursuant to 42 U.S.C. §

1983. (Doc. 1). The matter is proceeding via a second amended complaint. (Doc. 63).

The remaining Defendants are Lieutenant Wagner, Correctional Officer Robert Derr,

Correctional Officer Swartz, and Nurse Julie Rodak (collectively, the remaining "Corrections

Defendants"). Presently pending before the Court is the Corrections Defendants' motion

(Doc. 102) for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the

reasons set forth below, the Court will grant the Corrections Defendants' motion (Doc. 102)

and enter judgment in their favor.

**I.    Legal Standard**

Through summary adjudication, the court may dispose of those claims that do not

present a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a). "As to materiality,

. . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## II. **Statement of Undisputed Facts[1]**

Gibson is serving a 10–20-year state prison sentence for criminal attempt-murder and possessing an instrument of a crime. (Doc. 103 ¶ 1; Doc. 119 ¶ 1). The parties dispute whether Gibson is a dangerous and highly problematic inmate with an extensive history of assaultive and threatening behavior. (*Id.* ¶ 2).

---

[1]    Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. *Id.* Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (Docs. 103, 119). The Court notes that Gibson largely "disputes the adequacy of the defendants' factual presentation." (*See* Doc. 119).

The Corrections Defendants assert that, on October 20, 2020, a plan of action ("POA") was implemented as a result of Gibson's assaultive and self-injurious behaviors and communicated to staff by then Deputy Superintendent of Centralized Services Lori White.[2]  (Doc. 103 ¶ 3).  The POA was issued in harmony with DC-ADM 201, Sections 1(A) and (B), as it was not issued as a punitive measure but to keep Gibson safe from self-harm and to protect staff and other inmates from his assaultive behaviors.  (*Id.* ¶ 4).  The POA was developed in conjunction with lead representatives from psychology, psychiatry, and medical departments.  (*Id.* ¶ 5).  The POA requires all staff to adhere to its terms.  (*Id.* ¶ 6).  The POA directs that if Gibson engages in assaultive behavior, he will be placed in the restraint chair for a minimum of 8 hours and a maximum of 24 hours.  (*Id.* ¶ 7).  The POA contains detailed provisions for staff as to constant watch, medical/psychiatric care, exercise, authorization for restraint placement, and items to be provided to Gibson while he is in restraints.  (*Id.* ¶ 8).  The POA indicates that in order for Gibson to be released from the restraint chair he must demonstrate 8 consecutive hours of self-injury and assault free behavior and no threats of the same.  (*Id.* ¶ 9).  The POA directs that Gibson's restraint

---

[2]    Both parties submitted a copy of Gibson's POA, dated October 20, 2020, which provides, in part: "Derrick Gibson [] has an extensive history of both assaultive behavior as well as self-injury.  To date he has incurred a total of 184 misconducts to include 30 assaults.  He has also had 39 POC [psychiatric observation cell] placements for self-injurious behaviors and hunger strikes.  Although not seriously mentally ill, these behaviors are dangerous and we have a responsibility to keep him safe from self-harm and to protect our staff and inmates from his assaultive behaviors."  (Doc. 104-4, at 1; Doc. 129-6, at 5).

level be incrementally decreased from restraint chair to a "kufbag"[3], then to intermediate restraint system ("IRS"), and then to a total release from restraint systems. (*Id.* ¶ 10). The POA indicates that if Gibson engages in assaultive or self-injurious behavior while in any restraint, the entire progression, starting with restraint chair, will begin all over again. (*Id.* ¶ 11).

On December 5, 2020, at SCI-Mahanoy, just before 10:00 a.m., the Corrections Defendants assert that Registered Nurse ("RN") Rodak was triaging another inmate in the Restricted Housing Unit ("RHU") when she was notified by a correctional officer that Gibson was suicidal. (*Id.* ¶ 12). At approximately 10:00 a.m., RN Rodak and CO Mayernick arrived at Gibson's prison cell in the RHU, HA-12 cell. (*Id.* ¶ 13). Upon RN Rodak's arrival at Gibson's prison cell, Rodak asserts that Gibson informed her that he was suicidal and homicidal. (*Id.* ¶ 14). Gibson denies that he was suicidal or homicidal. (Doc. 119 ¶ 14). Gibson asserts that he was "in no medical need at that time" and RN Rodak and CO Mayernick's arrival at his cell was "unjustified and unauthorized." (*Id.* ¶ 13). RN Rodak asked Gibson if she could assess his vital signs so that she could report them to Dr. Newton. (Doc. 103 ¶ 15). Rodak asserts that Gibson agreed to allow her to assess his vital signs. (*Id.* ¶ 16). CO Mayernick opened the wicket aperture to Gibson's prison cell and RN Rodak begin taking his vital signs. (*Id.* ¶ 17). The Corrections Defendants assert that, as

---

[3] A kufbag is described as a "'Straight Jacket for the Hands' used for transporting high risk prisoners…which is used in conjunction with handcuffs, covers the hands and prevent[s] [prisoners] from being free to grab." *See* https://www.officer.com/command-hq/corrections/company/10039143/kufbag-inc.

RN Rodak was collecting Gibson's vital signs, he threw a cup of yellow liquid (believed to be urine) directly in RN Rodak's face. (*Id.* ¶ 18). They further assert that the unknown liquid also struck CO Mayernick's shirt. (*Id.* ¶ 19). Fixed surveillance camera at SCI-Mahanoy captured video footage of the moment when Gibson threw the unknown liquid substance through the wicket of his prison cell onto RN Rodak and CO Mayernick. (*Id.* ¶ 20). While the inside of Gibson's cell and Gibson himself are not visible on the camera, what is clear is that Rodak and Mayernick recoiled from the wicket area of the cell door as a result of Gibson's actions, confirming the expulsion of something at them. (See Doc. 105-8, Fixed Surveillance Video of A Pod Staff Assault, Dec. 5, 2020). Gibson denies that he assaulted RN Rodak and CO Mayernick. (Doc. 119 ¶ 23).

RN Rodak was directed to SCI-Mahanoy medical for assessment and reported to an outside hospital for further assessment and follow-up due to bodily fluid exposure. (Doc. 103 ¶ 21). On December 5, 2020, following Gibson's assault on her, RN Rodak was evaluated in the Geisinger Shamokin Area Community Hospital Emergency Department for exposure to bodily fluids. (*Id.* ¶ 22).

After Gibson's actions as described above, CO Mayernick secured the wicket to Gibson's prison cell, placed a plexiglass barrier on Gibson's prison cell door, and contacted the control center. (*Id.* ¶ 23). CO Mayernick then proceeded to medical for assessment. (*Id.* ¶ 24).

As a result of Gibson throwing fluid and assaulting staff, Lieutenant Wagner requested activity restrictions on December 5, 2020 at 10:50 a.m., which was approved by the shift commander.  (*Id.* ¶ 25).

On December 5, 2020, CO Mayernick issued Gibson prison misconduct number D531115 for his assault on RN Rodak.  (*Id.* ¶ 26; Doc. 119 ¶ 26).

The Corrections Defendants assert that, at approximately 11:00 a.m. on December 5, 2020, due to Gibson assaulting RN Rodak with fluids, Gibson was asked to prepare to exit his prison cell so that it could be searched, and its contents could be emptied.  (Doc. 103 ¶ 27).  Gibson initially hesitated to agree to allow officers to handcuff him through the wicket but eventually agreed to be handcuffed and to be escorted out of his prison cell so that it could be searched and emptied.  (*Id.* ¶ 28).  Gibson stood to the side of his prison cell, flanked by officers Derr and Swartz, while the cell was being searched and emptied.  (*Id.* ¶ 29).  Gibson was then escorted back into his prison cell and asked by Lt. Wagner to comply with a strip search.  (*Id.* ¶ 30).  Gibson refused to comply with the strip search request, became angry, and the Corrections Defendants assert that Gibson then told Lt. Wagner, "now I'm going to make you work now."  (*Id.* ¶ 31).  Gibson eventually requested to strip down himself, which officers were willing to allow him to do.  (*Id.* ¶ 32).  Gibson then indicated he was not going to strip down to his underwear as asked.  (*Id.* ¶ 33).  Gibson was warned by Lt. Wagner that if he did not comply with the request to strip down, he would be placed in the restraint chair.  (*Id.* ¶ 34).  The Corrections Defendants aver that Gibson then

told Lt. Wagner to "put him in the chair" and said to officers, "let's go get the chair."  (*Id.* ¶ 35).  Officers then proceeded to place a restraint chair in Gibson's prison cell.  (*Id.* ¶ 36).  At Lt. Wagner's direction, officer Defibaugh cut Gibson's prison issued jumpsuit off with scissors.  (*Id.* ¶ 37).  Lt. Wagner read Gibson restraint chair warnings prior to placement in the chair.  (*Id.* ¶ 38).  As officers flanked Gibson to prepare for restraint chair placement, Gibson assaulted Lt. Wagner by kicking Lt. Wagner's groin and leg area.  (*Id.* ¶ 39).  Gibson then moved backwards towards the restraint chair and the chair tipped backwards onto the bunk in the prison cell.  (*Id.* ¶ 40).  As officers were attempting to gain compliance from Gibson and secure him in the restraint chair, the Corrections Defendants assert that he immediately began regurgitating and pulling up phlegm in his throat and mouth.  (*Id.* ¶ 41).  Gibson then spat into CO Derr's masked face.  (*Id.* ¶ 42).  The fluid that Gibson spat is visible on CO Derr's mask.  (*See* Doc. 105-12, Handheld Audio/Video of Gibson Assault on Lt. Wagner, OC Spray, Restraint Chair Placement, and Medical Decontamination, Dec. 5, 2020).

A single burst of oleoresin capsicum ("OC") spray was deployed by Lt. Wagner to assist officers in gaining control of Gibson.  (Doc. 103 ¶ 43).  Gibson continued to resist officers and attempted to flail his hips and body off the chair.  (*Id.* ¶ 44).  Gibson can be heard breathing through the entire struggle with officers.  (*Id.* ¶ 45).  Gibson was then tilted back upright in the restraint chair approximately ten minutes after OC was deployed and Gibson was secured with foot shackles and straps.  (*Id.* ¶ 46).  Gibson was then wheeled

out of his prison cell in the restraint chair to medical where he was medically assessed and decontaminated by Nurse Liebersohn. (*Id.* ¶ 47). Gibson disputes this "factual presentation." (Doc. 119 ¶¶ 27-47). He asserts that the OC spray was deployed immediately, and the restraint chair was violently tiled backwards, causing his head to hit the metal bedframe. (*Id.*).

Nurse Liebersohn began his medical assessment of Gibson approximately eleven minutes and thirty-four seconds after OC spray was deployed. (Doc. 103 ¶ 48). The parties dispute whether Gibson suffered significant physical injury as a result of OC spray deployment or restraint chair placement. (*Id.* ¶ 49; Doc. 119 ¶¶ 49-50). Nurse Liebersohn noted Gibson's complaints of shortness of breath and that he hit his head (but observed no head injury), mild redness of Gibson's eyes and a small amount of blood on Gibson's abdomen which Gibson expelled from his nose. (*Id.* ¶ 50). Nurse Liebersohn documented that Gibson was not actively bleeding. (*Id.* ¶ 51). Gibson was decontaminated and circulation checks were conducted which were within the normal limits. (*Id.* ¶ 52). The Corrections Defendants aver that Gibson was medically cleared and then wheeled back into his prison cell in the restraint chair. (Doc. 103 ¶ 53). Gibson counters that he was not cleared by a physician or psychiatrist. (Doc. 119 ¶ 53).

Per the operative POA, Gibson was authorized to be in the restraint chair for a minimum of eight hours before being moved to kufbags and then to the IRS. (Doc. 103 ¶

54). Captain Evans authorized restraint chair placement, and Gibson was medically and psychiatrically cleared for restraint chair placement. (*Id.* ¶ 55).

Gibson was issued misconduct number D531116 for his kick to Lt. Wagner's groin and leg area. (*Id.* ¶ 56). Gibson was issued misconduct number D534407 for vomiting and spitting bodily fluid in CO Derr's face. (*Id.* ¶ 57; Doc. 105-20, Misconduct Report D534407).

During Gibson's time in the restraint chair, he was under consistent observation by staff. (Doc. 103 ¶ 58). Gibson was offered food, medication, exercise, and opportunity to go to the bathroom. (*Id.* ¶ 59).

On December 5, 2020 at approximately 7:54 p.m., staff were assembled, and Gibson was moved from the restraint chair to a kufbag restraint system per the approved POA. (*Id.* ¶ 60). Kufbag placement was approved and kufbag warnings were provided. (*Id.* ¶ 61). On December 5, 2020, Gibson was seen by medical and photographed upon removal from the restraint chair. (*Id.* ¶ 62). None of the remaining Defendants was involved in moving Gibson from the restraint chair to kufbags on December 5, 2020. (*Id.* ¶ 63). No injuries were observed when Gibson was released from the restraint chair and moved to kufbags. (*Id.* ¶ 64).

On December 6, 2020, at approximately 7:30 p.m., staff were assembled to remove Gibson from the kufbags and place him in the IRS per the approved POA. (*Id.* ¶ 65). Once at his prison cell door, Gibson became non-complaint with all orders given as he was instructed by Lt. Taylor to back up from his prison cell door but refused to do so. (*Id.* ¶ 66).

10

Lt. Taylor informed Gibson that if he did not comply with orders to back up, he would be placed in the restraint chair. (*Id.* ¶ 67). Gibson still failed to back up from his prison cell door as directed. (*Id.* ¶ 68). Lt. Taylor then ordered Gibson to be placed back in the restraint chair due to non-compliance with orders. (*Id.* ¶ 69). Lt. Taylor provided restraint chair warnings. (*Id.* ¶ 70). During the restraint chair placement, Gibson attempted to bite CO Bonk on his right forearm. (*Id.* ¶ 71). Gibson was eventually secured in the restraint chair. (*Id.* ¶ 72). Gibson was seen by medical and did not appear to suffer any injuries. (*Id.* ¶ 73). Gibson was issued misconduct number D171941 for attempting to bite CO Bonk. (*Id.* ¶ 74). None of the remaining Defendants was involved in attempting to remove Gibson from the restraint chair to the kufbags or in placing him back in the restraint chair on December 6, 2020. (*Id.* ¶ 75).

Gibson was monitored by staff during his time back in the restraint chair beginning on December 6, 2020. (*Id.* ¶ 76). Gibson was afforded the opportunity to exercise his limbs, drink water, and use the urinal every two hours while in the restraint chair. (*Id.* ¶ 77).

On December 7, 2020, at approximately 3:58 p.m., staff were assembled to remove Gibson from the restraint chair and place him in the kufbags per the approved POA. (*Id.* ¶ 78). Gibson was moved to the kufbags without incident. (*Id.* ¶ 79). Gibson was seen by medical, and no injuries were noted. (*Id.* ¶ 80). None of the remaining Defendants was involved in removing Gibson from the restraint chair and placing him in the kufbags on December 7, 2020. (*Id.* ¶ 81).

On December 8, 2020 at approximately 2:30 p.m., staff were assembled to remove Gibson from the kufbag to the IRS per the approved POA.  (*Id.* ¶ 82).  Gibson was moved to the IRS without incident.  (*Id.* ¶ 83).  Gibson was seen by medical, and no injuries were noted.  (*Id.* ¶ 84).  None of the remaining Defendants was involved in Gibson's move from the kufbags to the IRS on December 8, 2020.  (*Id.* ¶ 85).

On December 9, 2020, at approximately 3:00 p.m., staff were assembled to remove Gibson from the IRS per the approved POA.  (*Id.* ¶ 86).  Gibson was removed from the IRS without incident.  (*Id.* ¶ 87).  Gibson was seen by medical, and the only injury noted was a superficial skin tear to his right hand.  (*Id.* ¶ 88).  During his time in restraints, the Corrections Defendants assert that Gibson was visited by medical and mental health professionals for assessment and was offered food, bathroom, medication, and exercise.  (*Id.* ¶ 89).  Gibson disputes whether he was offered food, medication, exercise, or the use of a bathroom.  (Doc. 119 ¶ 59).  The parties also dispute whether Gibson lodged verbal threats and was combative with medical and mental health professionals.  (Doc. 103 ¶ 90; Doc. 119 ¶ 90).  The parties further dispute whether Gibson refused assessment and/or care, was uncooperative with medical and mental health staff, and engaged in self-injurious behavior by going on a hunger strike.  (*Id.* ¶ 91).  None of the remaining Defendants was involved in removing Gibson from the IRS on December 9, 2020.  (Doc. 103 ¶ 92).

On December 18, 2020, Gibson was found guilty of prison misconducts D531115,

D531116, D534407, and D171941 related to his December 5, 2020 assaults on RN Rodak,

Lt. Wagner, and officer Derr, and the December 6, 2020 assault on officer Bonk.  (*Id.* ¶ 93).

At the hearing on misconduct number D531115 (throwing bodily fluids in RN Rodak's

face), the Corrections Defendants aver that Gibson corroborated RN Rodak's report that he

alleged he was suicidal at the time of her initial examination of him.  (*Id.* ¶ 94).  Gibson

maintains that he did not assault RN Rodak.  (Doc. 119 ¶ 94).

The Department's administrative grievance system is codified in DC- ADM 804 and

provides a procedure by which inmates can seek redress for various issues.  (Doc. 103 ¶

95; Doc. 119 ¶ 95).  DC-ADM 804 establishes a three-step process for the resolution of

inmate grievances: (1) the initial grievance; (2) an appeal to the Facility Manager; and (3) an

appeal to final review to the Secretary's Office of Inmate Grievance Appeals ("SOIGA").  (*Id.*

¶ 96).  DC-ADM 804 also includes detailed instructions regarding the timing and required

content of grievances.  (*Id.* ¶ 97).  Per DC-ADM 804, a grievance must include information

that identifies "individuals directly involved in the event(s)."  (*Id.* ¶ 98).  Per DC-ADM 804,

the inmate is required to "specifically state any claims he wishes to make concerning

violations of Department directives, regulations, court orders, or other law."  (*Id.* ¶ 99).

The Corrections Defendants assert that Gibson filed one grievance with respect to

the December 5, 2020, OC spray and restraint chair incident, which was assigned grievance

number 907006.  (*Id.* ¶ 100).  Gibson submitted two very similar grievance forms with

respect to the December 5, 2020, OC spray and restraint chair incident and both forms were accepted and processed under a single grievance number of 907006. (*Id.* ¶ 101). Gibson only named Lt. Wagner and CO Derr in grievance number 907006 and failed to name nurse Rodak or Officer Swartz in said grievance. (*Id.* ¶ 102). Gibson did not complain of medical malpractice by nurse Rodak and did not complain about any medical care in the grievance. (*Id.* ¶ 103). Gibson counters that he submitted several grievances with respect to the events of December 5, 2020 through December 10, 2020. (Doc. 119 ¶ 100).

Gibson's grievance number 907006 was denied at the initial level. (Doc. 103 ¶ 104). Gibson contends that the grievance was improperly denied at the initial level. (Doc. 119 ¶ 104). Gibson appealed to the Facility Manager. (Doc. 103 ¶ 105; Doc. 119 ¶ 105). The Facility Manager denied grievance number 907006 at the second level. (*Id.* ¶ 106). Gibson contends that the grievance was improperly denied at the second level. (Doc. 119 ¶ 105). Gibson appealed to SOIGA. (Doc. 103 ¶ 107). Gibson failed to include a copy of his appeal to the Facility Manager with his final appeal to SOIGA, as required by DC-ADM 804, Section 2(B)(1)(j)(3), (6). (*Id.* ¶ 108). SOIGA dismissed grievance number 907006 on procedural grounds; SOIGA did not decide grievance number 907006 on the merits. (*Id.* ¶ 109). Gibson asserts that he sent a copy of the Facility Manager's response to SOIGA. (Doc. 119 ¶ 108).

Gibson's allegations of abuse related to the December 5, 2020 OC spray and restraint chair incident were investigated by SCI-Mahanoy Case Security Lieutenant

14

Trometter and determined to be unfounded. (Doc. 103 ¶ 110). Lieutenant Trometter's findings were reviewed and agreed with by the Bureau of Special Investigations and Intelligence. (*Id.* ¶ 111; Doc. 119 ¶ 111).

On April 5, 2023, Gibson filed a certificate of merit in support of his professional negligence claim against RN Rodak and others, asserting that he is in possession of a report from an expert. (Doc. 103 ¶ 112). Gibson failed to attach a written statement from an appropriate licensed professional to his April 5, 2023, certificate of merit. (*Id.* ¶ 113). On May 10, 2024, defense counsel filed a notice of intent to dismiss pursuant to Pennsylvania Rule of Civil Procedure 1042.11, 12. (*Id.* ¶ 114).

On June 14, 2024, Gibson filed a certificate of merit asserting that no expert testimony is necessary with respect to his medical malpractice claim against RN Rodak. (*Id.* ¶ 115; Doc. 119 ¶ 115). Then, on July 22, 2024, defense counsel filed a notice of intent to dismiss the medical malpractice claim against RN Rodak pursuant to Pennsylvania Rule of Civil Procedure 1042.7. (*Id.* ¶ 117).

On August 8, 2024, Gibson filed another certificate of merit - *res ipsa loquitor*. (*Id.* ¶ 118). In this certificate, Gibson again asserted that expert testimony is unnecessary for prosecution of his claim. (*Id.* ¶ 119).

## III.   Discussion

Gibson is serving a 10–20-year sentence for criminal attempt-murder and possession of an instrument of a crime. (Docs. 105-1, 105-2). The DOC Misconduct

15

Report reveals that Gibson has an extensive institutional misconduct history marked by violent, destructive, and self-injurious behavior. (Doc. 105-3). He has been a highly disruptive inmate and was found guilty of 236 misconducts between October 9, 1997, and September 11, 2024. (*Id.*). It should be noted, however, that Gibson was exonerated of 31 other misconducts. (*Id.*). The crux of this lawsuit are claims of excessive force and professional negligence stemming from events on December 5, 2020, while Gibson was housed at SCI-Mahanoy. (Doc. 63).

The remaining Corrections Defendants argue that judgment must be entered in their favor on the following grounds: (1) Gibson failed to properly exhaust the available administrative remedies by failing to include a copy of his appeal to the Facility Manager with his final grievance appeal; (2) Gibson failed to properly exhaust the available administrative remedies by failing to name Defendants Rodak and Swartz in his grievance; and, alternatively, (3) Gibson failed to file a proper certificate of merit with respect to the professional negligence claim against Defendant Rodak; (4) Gibson failed to allege any facts supporting a professional negligence claim against Defendant Rodak; and (5) Gibson failed to establish an excessive force claim against Defendant Wagner, Swartz, and Derr. (Doc. 104). The Court considers each argument below.

A.    Exhaustion of Administrative Review

The remaining Corrections Defendants contend that Gibson failed to properly exhaust any grievances against them in the prison's administrative review process prior to

16

proceeding to federal court.  (Doc. 104, at 15-19).  The Prison Litigation Reform Act of 1995

("PLRA"), 42 U.S.C. § 1997e *et seq.*, requires prisoners to exhaust available administrative

remedies before suing prison officials for alleged constitutional violations.  *See id.* §

1997e(a); *Ross v. Blake*, 578 U.S. 632, 639, 642 (2016) (explaining that only "available"

remedies must be exhausted).  The PLRA "exhaustion requirement applies to all inmate

suits about prison life, whether they involve general circumstances or particular episodes,

and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S.

516, 532 (2002).  It has been made clear that the exhaustion requirement is mandatory.

*See Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007); *see also Booth v. Churner*, 532

U.S. 731, 741 (2001) (holding that the exhaustion requirement of the PLRA applies to

grievance procedures "regardless of the relief offered through administrative procedures");

*Nyhuis v. Reno*, 204 F.3d 65, 67 (3d Cir. 2000) (same).  "[I]t is beyond the power of [any]

court…to excuse compliance with the exhaustion requirement."  *Nyhuis*, 204 F.3d at 73

(quoting *Beeson v. Fishkill Corr. Facility*, 28 F. Supp.2d 884, 894-95 (S.D.N.Y. 1998)).

To exhaust administrative remedies an inmate must comply with all applicable

grievance procedures and rules.  *Spruill v. Gillis*, 372 F.3d 218, 231 (3d Cir. 2004).  The

PLRA requires not only technical exhaustion of the administrative remedies, but also

substantial compliance with procedural requirements.  *Spruill*, 372 F.3d at 227-32; *see also*

*Nyhuis*, 204 F.3d at 77-78.  A procedural default by the prisoner, either through late or

improper filings, bars the prisoner from bringing a claim in federal court unless equitable

considerations warrant review of the claim. *Spruill*, 372 F.3d at 227-32; *see also Camp v. Brennan*, 219 F.3d 279 (3d Cir. 2000). A procedural default may be excused, however, if the prisoner can show that the administrative remedies were unavailable to him. *See Rinaldi v. United States*, 904 F.3d 257, 266 (3d Cir. 2018) (stating that "[t]he PLRA requires only 'proper exhaustion,' meaning exhaustion of those administrative remedies that are 'available'" (quoting *Woodford v. Ngo*, 548 U.S. 81, 93 (2006)). "An administrative remedy is unavailable when it "operates as a simple dead end[,]...is so opaque that it becomes, practically speaking, incapable of use, or when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020) (quoting *Shifflett v. Korszniak*, 934 F.3d 356, 365 (3d Cir. 2019)).

As stated, the DOC employs a three-step grievance process that must be completed to properly exhaust administrative remedies in most cases. *See Booth v. Churner*, 206 F.3d 289, 292 n.2 (3d Cir. 2002); *Commonwealth of Pa., Dep't of Corr., Inmate Grievance Sys.*, Policy No. DC-ADM 804 ("DC-ADM 804"). If informal resolution attempts do not resolve the problem, the first step is to file a written grievance (using form DC-804, Part 1) with the Facility Grievance Coordinator within 15 working days after "the event upon which the claim is based." DC-ADM 804 § 1(A)(3)-(5). An adverse decision by the Grievance Coordinator may be appealed to the Facility Manager within 15 working days of the initial-review response or rejection. *Id.* § 2(A)(1). Finally, the decision of the Facility Manager may be

appealed to "Final Review" with the Secretary's Office of Inmate Grievances and Appeals, and again must be submitted within 15 working days of the date of the Facility Manager's decision. *Id.* § 2(B)(1).

The DOC has specific requirements for grievances submitted by inmates. Those requirements include, among other things, that the grievance "be legible [and] understandable"; "include a statement of the facts relevant to the claim" as well as "the date, approximate time, and location of the event(s) that gave rise to the grievance"; that the prisoner "identify individuals directly involved in the event(s)"; and that the grievance include "the specific relief sought," including "compensation or other legal relief normally available from a court." *Id.* § 1(A)(11).

The remaining Corrections Defendants assert that Gibson filed one relevant grievance—number 907006. (Doc. 104, at 15-18; Doc. 103 ¶¶ 100-109; Doc. 105-49). On December 20, 2020, Gibson filed grievance number 907006 with respect to the December 5, 2020, OC spray and restraint chair incident. (Doc. 105-49). In the grievance, Gibson named Lieutenant Wagner and correctional officer Derr. (*Id.*). Gibson did not name nurse Rodak or correctional officer Swartz. (*Id.*). He also did not complain of medical malpractice by nurse Rodak or any inadequate medical care. (*Id.*). Following an extension of time, initial review of this grievance was conducted by Zone Lieutenant Trometter. (Doc. 105-50). Lieutenant Trometter denied the grievance on initial review, and found as follows:

> In your grievance you claim that Officer Derr inserted a hose which was attached to a OC can. You claim that he then sprayed military force OC up

your right nostril while strapped into a restraint chair. You also claim that OC was sprayed upon the bedframe and both back and side walls.

After conducting a thorough investigation where I interviewed 8 staff members and watched video footage from a handheld video camera, your grievance couldn't be further from the truth. It was LT. Wagner that deployed OC and not Officer Derr. Lt. Wagner is seen deploying only 1 burst of OC to your head and face region. Lt. Wagner, nor did any other staff deploy OC to the bed or the back and side walls. The can of OC that he used was an MK 3 which cannot be affixed with attachments such as a hose.

You also state that Officer Derr stated to you prior to entering your cell that "I can't wait to get into that cell and kill you". However, this was discredit[ed] by the fact that the handheld camera recorded the exact time Officer Derr arrived at your cell with LT. Wagner. At this time prior to removing you from your cell, it was LT. Wagner who communicated with you in an attempt to gain compliance and not Officer Derr.

At this time, your grievance is denied due to being fictitious, baseless, and without merit.

(*Id.* at 2).

Gibson appealed the first-level denial to the Facility Manager. (Doc. 105-51). The

Facility Manager upheld the initial response that denied the grievance, and reasoned as

follows:

I am in receipt of your grievance appeal in which you state you feel your grievance should have been addressed by SCI-Mahanoy Security Department and/or OSII [the Department's Office of Special Investigations and Intelligence], not a Zone Lieutenant.

Upon review of all information, it is noted that your grievance/Allegation of Abuse was in fact investigated by the SCI-Mahanoy Security Department and revised by OSII. Your allegations were unfounded and your grievance was, therefore, denied.

As such, I am upholding the decision of the grievance officer and deny this appeal and any request for relief.

(Doc. 105-52; Doc. 129-8, at 2).

Gibson filed an appeal to SOIGA. (Doc. 105-53). Gibson's final appeal to SOIGA was dismissed on procedural grounds on June 15, 2021, for failure "to provide the proper documents needed to appeal to final review." (Doc. 105-54; Doc. 129-3, at 4). Specifically, SOIGA found that Gibson "failed to provide a copy of [his] appeal to the facility manager[,]" as required by DC-ADM 804. (*Id.*).

Two conclusions can be drawn from this grievance history. First, Gibson never identified Defendants Rodak and Swartz in his grievance as committing an act or omission that potentially violated his constitutional rights, and never complained of medical malpractice by Defendant Rodak. Gibson is not excused from administratively exhausting claims against Rodak and Swarz—as required by the PLRA.

Second, Gibson never exhausted the claims against Defendants Wagner and Derr in grievance number 907006. Gibson did appeal grievance number 907006 to SOIGA; however, it is undisputed that SOIGA dismissed the final appeal for failure to submit the proper documentation. (Doc. 105-54). As stated, the DOC's grievance policy consists of three steps. The final step involves an appeal to the SOIGA within 15 working days of the Facility Manager's Appeal Response. A proper appeal to final review must include: "(1) a legible copy of the Initial Grievance; (2) a copy of the initial review response/rejection and/or remanded initial review response/rejection; (3) a legible copy of the Inmate Appeal to the

Facility Manager; (4) a copy of the Facility Manager/designee's decision and/or remanded

Facility Manager/designee's decision; (5) a written appeal to the SOIGA…"  DC-ADM 804 §

2(B)(1)(j).  "[F]ailure to provide any of the documentation noted above may result in the

appeal being dismissed."  *Id.* § 2(B)(1)(j)(6).  The evidence confirms that Gibson failed to

comply with these requirements.  A prisoner's failure to comply with the procedural and

substantive requirements of the DOC's grievance policy, as set forth in DC-ADM 804,

results in procedural default, thereby precluding an action in federal court.  *See Woodford*,

548 U.S. at 84, 90-91; *Spruill*, 372 F.3d at 227-32.

As the remaining Corrections Defendants have provided evidence to support their

failure to exhaust defense, the burden shifts to Gibson to produce evidence that the DOC

grievance remedies were not available to him.  Gibson has failed to meet this burden.

Gibson has not provided any basis to excuse his procedural default of grievance

number 907006.  Instead, Gibson argues that he exhausted his administrative remedies via

DC-ADM 001.[4]  (Doc. 121, at 6).  In the DOC, the exclusive procedure for exhausting

administrative remedies on a grievance is provided by DC-ADM 804.  *See Prater v. Dep't of*

*Corrs.*, 76 F.4th 184, 203 (3d Cir. 2023).  Although lower courts previously treated DC-ADM

001 as providing an alternative means of exhausting administrative remedies, the United

States Court of Appeals for the Third Circuit foreclosed such a theory of exhaustion in

---

[4]    The Department of Corrections maintains an "Inmate Abuse" policy at DC-ADM 001.  The
purpose of ADM 001 is "to ensure that staff do not subject an inmate to corporal or unusual punishment, or
personal abuse or injury."  *Prater v. Dep't of Corr.*, 76 F.4th 184, 204 (3d Cir. 2023).

*Prater*. *See Prater*, 76 F.4th at 203. In *Prater*, the Third Circuit noted that the

"interrelatedness" of DC-ADM 804 and DC-ADM 001 "does not suggest the two are

interchangeable. ADM 804's cross reference to ADM 001 reveals that the two policies work

in tandem, not in place of one another." *Id.* Thus, once an investigation is completed

pursuant to DC-ADM 001, the inmate must still exhaust his administrative remedies using

the appeal processes outlined in DC-ADM 804. *See Prater*, 76 F.4th at 203-04; DC-ADM

804 § 2(A)(1)(a). Gibson's OSII investigation was completed on February 26, 2021. (Doc.

105-55). Following this investigation, he was required to complete DC-ADM 804's appeals

process. *See Prater*, 76 F.4th at 203-04 (holding that DC-ADM 804 is the exclusive means

for exhausting a grievance and that an inmate whose grievance has been referred for

investigation under DC-ADM 001 must complete DC-ADM 804's appeals process after the

investigation is complete). Gibson failed to do so. He has not presented any evidence that

he complied with the requirements of Section 2 of DC-ADM 804 regarding appeals to Final

Review. It is thus undisputed that Gibson failed to comply with the requirements of DC-

ADM 804 for filing a proper appeal to final review.

Gibson also submitted the following grievances and appeals: grievance number

907358, dated December 28, 2020, wherein he complained about events of December 8,

2020; the initial review response of grievance number 907358, denying said grievance; an

appeal to the Facility Manager of grievance number 907006, dated March 21, 2021,

regarding allegations of staff abuse; grievance number 1109927, dated September 13,

2024, regarding discovery material that he received in relation to this matter; grievance number 1109370, dated September 12, 2024, wherein he requested to review audio and video footage from December 5 through 10, 2020; grievance number 1119156, dated November 25, 2024, which is illegible; and, a decision of SOIGA dismissing the appeal of grievance number 884649.  (Doc. 120-2, at 8, 13, 15-19; Docs. 129-4, 129-5).  None of these grievance documents establish that Gibson properly grieved the remaining claims in this action, nor do they establish that Gibson properly identified and grieved the claims against the remaining Corrections Defendants in this action.

Under certain circumstances, administrative remedies may not be effectively available to an inmate, preventing a timely pursuit of the prison grievance process.  *See, e.g., Camp*, 219 F.3d at 281; *Shifflett*, 934 F.3d at 359 ("a prisoner exhausts his administrative remedies as soon as the prison fails to respond to a properly submitted grievance in a timely fashion"); *Robinson v. Superintendent Rockview SCI*, 831 F.3d 148, 154 (3d Cir. 2016) (holding that prison officials rendered plaintiff's administrative remedies unavailable when they failed to timely respond to his grievance and ignored his follow-up requests for a decision).  The record simply does not support a finding that the administrative process was unavailable to Gibson.  To the contrary, it establishes that Gibson had full and ready access to the administrative remedy process.

In sum, grievance number 907006 was not properly exhausted.  Gibson has not provided any basis to excuse his failure to exhaust administrative remedies.  Under Rule 56,

Gibson was required to establish the existence of a genuine dispute of material fact. *See Celotex Corp.*, 477 U.S. at 324. He has failed to do so. Consequently, the Court concludes that Gibson has not properly exhausted the remaining claims in this action, and the Corrections Defendants are entitled to an entry of summary judgment in their favor. *See Spruil*, 372 F.3d at 222, 230.

Even had Gibson properly exhausted, the Corrections Defendants are entitled to summary judgment on the merits of the claims, as set forth below.

B.    Professional Negligence Claim against Rodak

### 1.    Certificate of Merit Requirement

Under Pennsylvania law, medical negligence "can be broadly defined as the unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services." *Toogood v. Owen J. Rogal, D.D.S., P.C.*, 573 Pa. 245, 254-55 (2003) (internal citations and quotations omitted). Thus, a plaintiff must establish a duty owed by the physician or medical personnel to the patient, a breach of that duty, that the breach was the proximate cause of the plaintiff's injury, and that the damages suffered were a direct result of the harm. *Toogood,* 573 Pa. at 254-55. In addition, "[w]ith all but the most self-evident medical malpractice actions there is also the added requirement that the plaintiff must provide a medical expert who will testify as to the elements of duty, breach, and causation." *Quinby v. Plumsteadville Family Practice, Inc.*, 589 Pa. 183, 199 (2006); *see*

*also Brady v. Urbas*, 111 A.3d 1155, 1162 (Pa. 2015) ("Except in the most obvious cases of negligence (such as where a gauze pad is left inside a patient's body), expert testimony is necessary to establish the standard of care."); *Toogood*, 573 Pa. at 254-55 ("Because the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons a medical malpractice plaintiff must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury." (internal citations and quotations omitted)).

Pennsylvania Rule of Civil Procedure 1042.3 further requires a plaintiff alleging professional negligence to file a certificate of merit within 60 days of filing the complaint. PA. R. CIV. P. 1042.3. The certificate must include one of the following: a written attestation by "an appropriate licensed professional" that there is a "reasonable probability that the care, skill or knowledge exercised or exhibited" by the defendant "fell outside acceptable professional standards," and that this was the cause of the plaintiff's injuries; a statement that the claim against the defendant is based only on the professional negligence of those for whom the defendant is responsible; or a statement that expert testimony is unnecessary for the plaintiff's claim to proceed. PA. R. CIV. P. 1042.3(a)(1)-(3). Should a plaintiff certify that expert testimony is unnecessary, "in the absence of exceptional circumstances the attorney is bound by the certification and, subsequently, the trial court shall preclude the plaintiff from presenting testimony by an expert on the questions of standard of care and

causation." PA. R. CIV. P. 1042.3(a)(3). Failure to file a certificate of merit is fatal to a plaintiff's claim. PA. R. CIV. P. 1042.7.

The Pennsylvania Supreme Court has noted that "[b]ecause the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons[,] a medical malpractice plaintiff must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury." *Toogood*, 824 A.2d at 1145. A very narrow exception applies "where the matter is so simple or the lack of skill or care is so obvious as to be within the range of experience and comprehension of even non-professional persons." *Hightower-Warren v. Silk*, 698 A.2d 52, 54 n.1 (Pa. 1997).

In June of 2024, Gibson filed a certificate of merit in which he declared that "expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claims asserted against Defendant Julie Rodak, Nurse." (Doc. 83, at 18). On July 22, 2024, defense counsel filed a Notice of Intention to Dismiss pursuant to Pennsylvania Rule of Civil Procedure 1042.7. (Doc. 84). On or about August 8, 2024, Gibson filed another certificate of merit - *res ipsa loquitor.* (Doc. 86). In this certificate, Gibson asserted that Defendant Rodak's actions "fell outside of acceptable professional standards," and that this "was a cause in bringing about the harm." (Doc. 86).

The Pennsylvania Rules of Civil Procedure clearly state that a plaintiff is bound by his certification that "an expert is unnecessary for the prosecution of the claims, in the

27

absence of exceptional circumstances." PA. R. CIV. P. 1042.3(a)(3). The Rules further state

that as a result of such certification, "the trial court shall *preclude the plaintiff from*

*presenting testimony by an expert* on the questions of standard of care and causation." *Id.*

(emphasis added); *see also Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 265 (3d

Cir. 2011) (explaining that "Pennsylvania law expressly allows a plaintiff to proceed on the

basis of a certification that expert testimony will not be required to prove her claim. Of

course, the consequence of such a filing is a prohibition against offering expert testimony

later in the litigation, absent 'exceptional circumstances.'") (citing PA. R. CIV. P.

1042.3(a)(3)). *Pro se* plaintiffs are not excluded from the binding and preclusive effects of a

section (a)(3) certification. *Illes v. Beaven*, No. 1:12-CV-0395, 2012 WL 2836581, at *4

(M.D. Pa. July 10, 2012) (explaining that the *pro se* plaintiff's (a)(3) certification that "he

does not need expert testimony precludes him from presenting such testimony"). Nor does

a plaintiff's *pro se* status constitute an "exceptional circumstance" sufficient to override the

expert testimony prohibition. *Cuevas v. United States*, Civil Action No. 09-43J, 2013 WL

4500470, at *10 (W.D. Pa. Aug. 21, 2013) *aff'd*, 580 F. App'x 71 (3d Cir. 2014).

  In this case, Gibson appears to assert that he has satisfied the requirements of

Pennsylvania's certificate of merit requirements by stating under Rule 1042.3(a)(3) that

"expert testimony of an appropriate licensed professional is unnecessary for prosecution of

the claims asserted against Defendant Julie Rodak, Nurse." (Doc. 83, at 18). As this

certification falls within section (a)(3) of the Pennsylvania Rules of Civil Procedure, Gibson

is therefore barred from offering expert testimony later in this litigation.  Again, Pennsylvania law requires expert testimony to establish a claim for medical negligence.  Therefore, without the ability to present expert testimony, Gibson is unable to establish a prima facie case for medical negligence, and therefore, cannot succeed on this claim.

Gibson, however, argues that expert testimony is unnecessary and seems to urge this Court to apply the exception to the requirement of expert testimony in medical negligence cases.  As mentioned briefly above, the Pennsylvania Supreme Court has defined a narrow exception to the expert testimony requirement where "the matter is so simple or the lack of skill or care so obvious as to be within the range of experience and comprehension of even non-professional persons, also conceptualized as the doctrine of *res ipsa loquitur*."  *Toogood*, 573 Pa. at 255 (internal citations omitted).  Adopting the language of the Restatement (Second) of Torts, Section 328D, the Pennsylvania Supreme Court has stated that *res ipsa loquitur* applies when three conditions are met, "(a) *either a lay person is able to determine as a matter of common knowledge, or an expert testifies*, that the result which has occurred does not ordinarily occur in the absence of negligence; (b) the agent or instrumentality causing the harm was within the exclusive control of the defendant; and (c) the evidence offered is sufficient to remove the causation question from the realm of conjecture, but not so substantial that it provides a full and complete explanation of the event."  *Toogood*, 573 Pa. at 262 (citing Restatement (Second) § 328D) (emphasis added).

Gibson argues that the circumstances of this case are such that a lay person could easily understand them and, therefore, fall within the stated exception. (*See* Doc. 86). The Court finds that the medical issues presented by Gibson require medical testimony and do not fall within the exception to the requirement of expert testimony. Arriving at a medical diagnosis and then determining the appropriate medical treatment plan is analytical and requires medical judgment. In evaluating the prison medical personnel's opinions and treatment of Gibson, the factfinder would need more than his common knowledge and experience as a layperson. Thus, the Court finds that the narrow exception does not apply, and medical expert testimony is required to prove both the standard of care, the breach thereof, and causation for Gibson's medical negligence claim. *See Cuevas*, 2013 WL 4500470, at *10, *aff'd*, 580 F. App'x 71 (3d Cir. 2014) (finding that a determination regarding whether delayed diagnosis of a foot injury constitutes medical malpractice "involves complex issues of medical care" and, therefore, the narrow exception to the expert testimony requirement does not apply). The Court finds that Defendant Rodak is entitled to summary judgment on the state law negligence claim, and the motion will be granted as to this claim.

### 2.    Merits of the Medical Professional Negligence Claim

The Corrections Defendants also seek summary judgment on Gibson's medical negligence claim against Rodak because Gibson failed to set forth facts establishing medical negligence. (Doc. 14, at 27-28). As stated, in order to maintain a medical

professional negligence claim, Gibson must establish the standard of care owed by Rodak as a medical professional, the breach of that standard of care, that the breach was the proximate cause of the harm suffered, and that the damages suffered resulted from the harm. *See Toogood*, 824 A.2d at 1145 (setting forth the elements of a medical malpractice claim).

Gibson asserts that Defendant Rodak "committed medical malpractice." (Doc. 63 ¶ 43). While he generally asserts a claim of medical malpractice, Gibson failed to set forth any evidence in support of this assertion. (*Id.*). For example, he failed to submit any evidence as to how Defendant Rodak contributed to his injuries or how she deviated from a particular standard of care and that her deviation caused injury. The evidence reveals that Defendant Rodak promptly arrived at Gibson's cell to assess him and take his vitals after he complained of being suicidal and homicidal. Gibson failed to produce any evidence that Defendant Rodak's actions caused him harm. The party adverse to summary judgment must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460 (3d Cir. 1989). Gibson has failed to meet this burden and failed to establish that Defendant Rodak committed medical malpractice.

C.    Excessive Force Claim against Wagner, Swartz, and Derr

Next, Gibson claims excessive force in violation of the Eighth Amendment against Defendants Wagner, Derr, and Swartz in relation to the December 5, 2020 incident involving OC spray and a restraint chair.  (Doc. 63 ¶¶ 31-33, 37).

In an Eighth Amendment excessive force case, the inquiry "is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).  Not "every malevolent touch by a prison guard" violates the Constitution.  *Id.* at 9.  "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'"  *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986)).  To establish an Eighth Amendment excessive force claim, an inmate does not need to show that he suffered a significant, or even a more than de minimis, injury.  *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010).  Rather, the central issue is the force used by the officer, not the resultant injury.  *Flood v. Schaefer*, 439 F. App'x 179, 182 (3d Cir. 2011).

When determining whether a prison official has used excessive force, the court must consider the following factors: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to

temper the severity of a forceful response. *Whitley*, 475 U.S. at 321; *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000).

Claims related to the use of restraints are evaluated under the standard applicable to excessive force claims. *Young v. Martin*, 801 F.3d 172, 180 (3d Cir. 2015). With respect to mechanical restraints, the Supreme Court identified the following criteria "relevant to the use of excessive force test, holding that (1) where the inmate had 'already been subdued, handcuffed, [and] placed in leg irons,' and (2) there was a 'clear lack of an emergency situation' such that '[a]ny safety concerns had long since abated,' then (3) subjecting the inmate to 'substantial risk of physical harm' and 'unnecessary pain' serves no penological justification." *Young*, 801 F.3d at 180 (quoting *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)).

Here, Gibson's claim ultimately fails because there is insufficient evidence for a reasonable factfinder to conclude that the use of force was maliciously and sadistically intended to cause harm to Gibson. The undisputed facts and videotape evidence demonstrate that: (1) Gibson assaulted Defendant Rodak by throwing a liquid substance in her face (Docs. 105-6, 105-7, 105-11)[5]; (2) after the assault on Rodak, Gibson refused to

---

[5]     Following the December 5, 2020 incident, Defendant Rodak completed an Employee Report of Incident Form. (Doc. 105-6). Therein, Defendant Rodak states that she asked Gibson if she could take his vital signs. (*Id.*). She states that Gibson agreed, and Rodak attempted to apply a blood pressure cuff to Gibson's arm through the wicket. (*Id.*). Defendant Rodak then recounts the incident as follows: Gibson "quickly pulled his arm back from the wicket and forcefully threw a cup full of yellow liquid (assumed urine) directly into this RN's face. This RN was told to return to medical for assessment where my mask and gown were collected, and I was instructed to go directly to the Frackville State Police and to the emergency department for an exposure." (*Id.*).

An Extraordinary Occurrence Report was also issued in relation to this December 5, 2020 incident. (Doc. 105-7). The Report provides that "[o]n 12/5/20 at 0958 RN Rodak approached inmate Gibson's cell to triage him. After CO1 Mayernick opened the wicket, Gibson threw an unknown liquid striking RN Rodak

comply with orders to submit to a strip search and, as officers were placing Gibson in the restraint chair, he kicked Defendant Wagner in the groin area and spat in Defendant Derr's face (*see* Doc. 105-8); Defendant Wagner then deployed the OC spray (Docs. 105-13, 105-15, 105-16); and (3) Defendants Wagner, Swartz, and Derr resorted to force to effect compliance only after Gibson assaulted Defendants Wagner and Derr.

For the first and second *Whitley* factors, there is undisputed evidence of a need to use force, and a reasonable juror could not find that attempts to secure Gibson were unreasonable or excessive. The fixed surveillance video, sans audio, commences with Defendant Rodak and a correctional officer walking up to Gibson's cell door after he expressed suicidal and homicidal thoughts. Defendant Rodak appears to be talking to Gibson through the wicket of his cell door when Rodak and Mayernick unexpectedly jump back from the wicket area, confirming the expulsion of a substance at them by Gibson. The correctional officer then secures the wicket of Gibson's cell, and the officer and Rodak leave the area.

Next, the handheld video captures the correctional officers removing Gibson from his cell so it could be searched. Gibson is escorted out of his cell and held nearby while the cell is searched. Once the search is complete, correctional officers escort Gibson

---

in the face and chest area and CO1 Mayernick on his shirt. The wicket was secured and RN Rodak reported to medical for decontamination." (*Id.*).

Additionally, Gibson was issued a misconduct report charging him with assault for striking an officer with an unknown liquid. (Doc. 105-11). Gibson was ultimately found guilty of assault, and the hearing examiner noted that Gibson did not offer any defense to the charge and "claim[ed] he was suicidal and [did] not remember the incident." (*Id.*).

back to his cell and Defendant Wagner asks him to submit to a strip search. Gibson refuses to comply, and the Corrections Defendants maintain that Gibson stated: "now I'm going to make you work now." (Doc. 103 ¶ 31). Gibson ultimately appears to submit to a strip search and a correctional officer removes Gibson's clothing by cutting the jumpsuit with scissors. The correctional officers then attempt to place Gibson in the restraint chair. As they are placing him in the restraint chair, Gibson, totally unprovoked, kicks Defendant Wagner in the groin and leg area. The correctional officers immediately restrain Gibson in the restraint chair and tilt the chair backwards. Gibson continues to flail and resist the officers. Although not entirely visible on the video, the other record evidence reveals that, while the officers were attempting to secure Gibson in the restraint chair, he spat in Defendant Derr's face. (Doc. 103 ¶¶ 41-42; Docs. 105-13, 105-15, 105-16, 105-20). The fluid that Gibson spat is visible on CO Derr's mask. (*See* Doc. 105-12). At this point, Defendant Wagner deploys OC spray. The officers place a mask and hood over Gibson's face. Gibson continues to resist and is eventually fully secured in the restraint chair.

Regarding the deployment of OC spray, some application of force was clearly necessary due to Gibson's refusal to obey direct orders and assault on staff members. "The use of chemical agents to subdue recalcitrant prisoners is not cruel and unusual when reasonably necessary." *Gibson v. Flemming*, 837 F. App'x 860, 862 (3d Cir. 2020) (quoting *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984)); *see also Passmore v. Ianello*, 528 F. App'x 144, 147 (3d Cir. 2013) (*per curiam*) (explaining that the use of chemical agents is not

a *per se* constitutional violation). Courts have widely upheld the reasonableness of using OC spray to gain compliance when a prisoner ignores orders from correctional officers. *See, e.g.*, *Martin v. Wetzel*, 2021 WL 2926005, at \*10 (W.D. Pa. July 12, 2021) (finding the use of OC spray necessary where the plaintiff "had covered the windows of his cell with a sheet" and "refused six orders…to come to the cell's door, uncover it, and cuff up."); *Easley v. Tritt*, 2021 WL 978815, at \*15 (M.D. Pa. Mar. 16, 2021) (use of OC spray necessary to gain compliance when inmate ignored several orders to come to his cell's door and submit for handcuffing); *Jones v. Wetzel*, 2017 WL 4284416, at \*7-10 (W.D. Pa. Sept. 27, 2017) (officer's use of OC spray was reasonable when inmate would not return items from his cell, covered his cell window, and refused multiple orders to uncover it).

Likewise, regarding the actions of Defendants Wagner, Swartz, and Derr, some application of force was clearly necessary to gain control of Gibson after he assaulted staff two members while attempting to place him in the restraint chair—Defendants Wagner and Derr. The videotape of the incident decisively refutes Gibson's claim that Defendants Wagner, Swartz, and Derr applied force in an intentionally malicious or sadistic manner. *See Jones*, 2017 WL 4284416, at \*10 (granting summary judgment where videotape evidence "clearly undermine[d] any potential determination that [there] was a malicious or sadistic use of force."). Nothing in the movements or body language of Wagner, Swartz, and Derr supports an inference of malicious or intentional misconduct. The officers do not appear irritated or upset. Rather, they are securing an inmate who just assaulted

correctional officers. The handheld video shows the officers conducting a strip search and placing Gibson in the restraint chair. Additionally, after the deployment of OC spray, the handheld video of the escort to the medical triage area indisputably shows that the officers did not use any physical force against Gibson. Defendants Wagner, Swartz, and Derr appear to show restraint and professionalism despite Gibson's recalcitrance. Consequently, the first two factors weigh in favor of summary judgment.

The third *Whitley* factor considers the extent of the injury inflicted. While the lack of significant injury weighs against an excessive force claim, it is not dispositive. *Aruanno v. Maurice*, 2019 WL 5597653, at *2 (3d Cir. Oct. 30, 2019); *Wilkins*, 559 U.S. at 38 ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."). Here, other than irritation to the eyes from the OC spray, there is no record evidence of any other injury. (Doc. 105-17). Gibson complained of shortness of breath and head pain. (*Id.*). However, upon examination, there were no signs of respiratory distress, and no swelling, tenderness, or signs of injury to the head. (*Id.*). Gibson received prompt medical treatment following the incident and has failed to adduce any evidence indicating that he sustained serious or lasting injuries from the December 5, 2020 incident.[6] *See, e.g., Gibson*, 837 F.

---

[6]    The uncontroverted record reflects that the OC spray was deployed on December 5, 2020, at 11:14 a.m., Gibson was taken to the triage area on December 5, 2020, at 11:20 a.m., and assessed and decontaminated on December 5, 2020, at 11:22 a.m. (Doc. 105-13). The medical records further reflect that Gibson complained only of head pain and shortness of breath from the OC spray. (Docs. 105-17, 105-47).

App'x at 862 ("temporary discomfort" from OC spray did not support a constitutional violation). Consequently, this factor also weighs in favor of summary judgment.

As to the fourth factor, there was a reasonable threat to the officers' safety, as well as other inmates' safety. The purpose in securing Gibson was initially in response to the assault on Defendant Rodak outside his cell. In response to this incident, officers attempted to conduct a strip search and place Gibson in a restraint chair when he committed the assault on Defendants Wagner and Derr. The officers then attempted to gain control over Gibson, who was combative, by deploying OC spray. Gibson's actions put his own safety, as well as the officers' safety, at risk. Given Gibson's disruptive behavior and refusal to follow orders, the Corrections Defendants' response was objectively reasonable under the circumstances. This factor decidedly favors summary judgment.

As to the fifth factor, the record reflects that the force ceased when the officers regained control. Courts must bear in mind that drawing a line as to where force should cease must be approached practically, "'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' making 'allowance for the fact that [ ] officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Johnson v. City of Philadelphia*, 837 F.3d 343, 350 (3d Cir. 2016) (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). This factor, like each of the others, supports summary judgment.

In summary, the record evidence would lead a reasonable trier of fact to find that Defendants Wagner, Swartz, and Derr used the amount of force necessary to control Gibson under the circumstances. *Tindell v. Beard*, 351 F. App'x 591 (3d Cir. 2009); *see also Whitley*, 475 U.S. at 319; *Fuentes v. Wagner*, 206 F.3d 335, 346 (3d Cir. 2000) (noting that even a prison officer's "over-reaction" to an inmate-caused disturbance would fall short of supporting a finding of excessive force where the totality of the circumstances indicated that the force was applied in a good faith effort to maintain order). No portion of the record supports an assertion that Defendants Wagner, Swartz, and Derr acted maliciously or sadistically to cause harm. Rather, they acted to gain control over an inmate that refused to obey orders and assaulted several prison staff members.

The party adverse to summary judgment must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. *Williams*, 891 F.2d at 460. Gibson has wholly failed to meet this burden. It is clear on the record that Defendants Wagner, Swartz, and Derr acted in a good faith effort to restore order and discipline. Defendants Wagner, Swartz, and Derr are therefore entitled to an entry of summary judgment on Gibson's Eighth Amendment excessive force claim.

## IV. Conclusion

Consistent with the foregoing, the Court will grant the motion (Doc. 102) for summary judgment filed on behalf of Defendants Wagner, Swartz, Derr, and Rodak.

A separate Order shall issue.

Robert D. Mariani
United States District Judge

Dated: June __14__, 2025